# SIXTH DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

Case No. 6D2023-2302
Lower Tribunal No. 2021-CA-008148-O

_____

BASHAR ATOUT, as Trustee of the HHM LAND TRUST DATED OCTOBER 29, 2013,

Appellant,

v.

BRENDA ROZANC and ONE SOURCE MANAGEMENT SOLUTIONS, INC., et al.,

Appellees.

_____

Appeal from the Circuit Court for Orange County.
A. James Craner, Judge.

July 31, 2026

NARDELLA, J.

Appellant, Bashar Atout, as Trustee of HHM Land Trust ("the Trust"), appeals the trial court's order dismissing with prejudice the Trust's Third Amended Complaint against Appellees, Brenda Rozanc and One Source Management Solutions, Inc. For the reasons below, we reverse.

Atout is an investor living in Kuwait. About a decade ago, he began acquiring rental homes in Apopka, Florida, placing legal title of the homes into a revocable trust which he controlled as Trustee. To manage these rental homes while he was abroad, Atout hired Brenda Rozanc ("Rozanc") from Premier Management Group, and when Rozanc left Premier to start her own management company, he went with

her and executed an agreement with Rozanc's new company, One Source Management Solutions, Inc. ("One Source"). In that Management Agreement, One Source promised the Trust that it would "manage, operate and lease" the properties during the term of the contract.

For whatever reason, as to four of the eighteen rental homes, One Source did not lease the homes on behalf of the Trust. Instead, it sold them without the Trust's knowledge or consent. One such sale Rozanc made to herself.

When Atout discovered this, the Trust filed a quiet title action and included One Source and Rozanc as defendants. Ultimately, the Trust managed to reclaim its legal ownership of the rental homes, allowing the Trust to pursue the attorney fees and costs incurred in restoring its ownership and the income it lost in the interim. It did this by adding three counts to its complaint: one for breach of contract and two for negligence.[1]

In its newly amended complaint, the Trust brought a breach of contract claim against the only party with which it was in privity, One Source. It alleged One Source breached the Management Agreement in several ways, including failing to manage

---

[1] For reasons unknown, the Trust did not bring other causes of action. Nor did it ever argue that it could successfully plead other causes of action if given an opportunity to amend. Accordingly, when determining whether the Trust should have had a chance to amend, we do not consider causes of action it did not bring or that it could bring if allowed to amend its complaint. *See Bocchino v. Fischer*, 645 So. 2d 1096, 1097 (Fla. 4th DCA 1994) ("consideration of the motion for leave to amend should be limited to the content of the pleading and the proposed amendment" not theoretical alternatives).

the rental homes, failing to account for rental income, transferring rental income without authorization, and wrongly retaining security deposits.

The Trust also brought a negligence count against One Source, in which the Trust simply retooled its breach of contract claim. It did so by alleging that One Source undertook a duty to manage its rental homes, without ever mentioning the obligation was contractual, and then reiterating the same factual allegations it previously alleged constituted breaches of contract. But this time, the Trust alleged those actions and omissions amounted to negligence.

After setting forth functionally identical causes of action in contract and tort against One Source, the Trust turned to Rozanc, with whom it was not in privity, and pleaded an action in negligence. As to that claim, the Trust alleged Rozanc owed the Trust a duty both in her role as property manager of the rental homes and as the licensed Florida realtor who effectuated the sales. As to her culpable conduct, the Trust attributed to Rozanc the same actions and omissions it previously charged against One Source, as well as two additional acts of negligence: taking a real estate commission on each sale without a written listing agreement and acting on forged documents when she facilitated the unauthorized sales.[2]

In response, both One Source and Rozanc moved to dismiss the Complaint. Beginning with the single breach of contract claim, One Source argued that an

---

[2] The Trust also asserted claims of professional malpractice and negligence against additional defendants, Douglas W. Oswald, Esq. and his law firm, Oswald & Oswald, P.L., which are not the subject of this appeal.

unauthorized sale of four rental homes did not breach the Management Agreement because the Management Agreement concerned only One Source's *leasing* of the rental homes. As the *sale* of the rental homes was never contemplated in the only contract between the two parties, a cause of action based in contract could not exist. To complement this argument, One Source and Rozanc then claimed that the mere existence of a contract between One Source and the Trust prohibited any action in negligence against both One Source, with which the Trust was in privity, and Rozanc, with whom it was not. Ultimately, the trial court accepted these arguments and further determined that "there does not appear to be a circumstance where the issues get better, so it appears to be appropriate to grant the motion to dismiss the third amended complaint with prejudice."

With its claims dismissed, and thus no path to recuperate the full extent of its losses, the Trust filed this appeal. Our review is de novo. *Morin v. Fla. Power & Light Co.*, 963 So. 2d 258, 260 (Fla. 3d DCA 2007) ("In reviewing an order granting a motion to dismiss for failure to state a cause of action, the standard of review is de novo.").

I

In its first issue raised on appeal, the Trust argues the trial court erred in dismissing with prejudice its breach of contract claim against One Source. We agree. The trial court erroneously accepted the premise that, because the Management Agreement did not specifically address the sale of the rental homes, One Source

4

could not breach the agreement by improperly selling another's home. What that premise ignores is that by selling the rental homes, One Source transferred control of them and thus broke its contractual obligation to "manage, operate and lease" the homes. Indeed, a contract need not anticipate and explicitly detail the precise mechanism or manner of the *breach* for a cause of action to lie when the promising party fails to fulfill an *obligation* in the contract. The contract need only identify the obligation. *See generally WSG W. Palm Beach Dev., LLC v. Blank*, 990 So. 2d 708, 713 (Fla. 4th DCA 2008) ("The parties need not have contemplated the precise injuries which occurred, as long as they could have reasonably been expected to flow from the breach."); *see also* 5 Arthur Linton Corbin, *Corbin on Contracts* §1010, at 79 (1964)) ("All that is necessary, in order to charge the defendant with a particular loss, is that it is one that ordinarily follows the breach of such a contract in the usual course of events, or that reasonable men in the position of the parties would have foreseen as a probable result of breach. It is not necessary that the parties should have given the matter a moment's thought or should have expressed themselves on the subject."). Here, the Management Agreement obligated One Source to "manage, operate and lease" the rental homes, and as alleged in the Complaint, One Source failed to perform that obligation.

But even if we were to accept this faulty premise, we would still be compelled to reverse because the Complaint identified additional provisions of the Management Agreement that One Source breached. For example, the Complaint alleged One

5

Source failed to properly account for rental income, transferred rental income without authorization, and improperly retained security deposits. All three of these specific breaches matched specific obligations listed in the Management Agreement. Yet the trial court dismissed the Trust's breach of contract claim with prejudice. This was error and reversal is warranted.

## II

In its second issue raised on appeal, the Trust argues the trial court erred in dismissing with prejudice its negligence claim against One Source. As to this contention, we disagree.

We begin our analysis of the Trust's negligence claims against One Source by making a simple observation: Although they share a common origin,[3] tort law and contract law address distinct obligations in modern society. As explained by English legal scholar Patrick Atiyah:

> For at least 100 years—and in many respects for more like twice that time—common lawyers have operated within a particular conceptual framework governing the law of obligations. Within this framework, the fundamental distinction has been that between obligations which are voluntarily assumed, and obligations which are imposed by law. The former constitutes the law of contract, the latter fall within the purview of the law of tort.

---

[3] The common law of contract and tort both evolved from the writ of assumpsit. *See generally* A. Simpson, *A History Of The Common Law Of Contract: The Rise Of Assumpsit* 199 (1975).

Patrick Atiyah, *Contracts, Promises and the Law of Obligation*, 94 L.Q. Rev. 193 (1978).

When a party fails to fulfill obligations it voluntarily assumed, the remedy lies in the law of contract, and that remedy traditionally tends toward restoring the aggrieved party's expectations through compelled performance or contemplated damages.[4] In contrast, when a party fails to fulfill obligations imposed by law, the remedy lies in the law of tort, which attempts to return the victim to his pre-injury position and compensates him for actual harm sustained.

As a result, tort remedies—free of the obstacles and limitations a contract may impose—are sometimes more desirable in the eyes of the aggrieved party.[5] And as outcomes tend to follow incentives, aggrieved parties have long sought to bring

---

[4] We recognize that modern contract law also provides for consequential damages at times. *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854), is the leading common law case on liability for consequential damages caused by failure or delay in carrying out a commercial undertaking. The rule of *Hadley v. Baxendale*– that consequential damages will be awarded only if the defendant was put on notice of the special circumstances giving rise to them–has long been applied in Florida. *W.U. Tel. Co. v. Taylor*, 94 Fla. 841, 846, 114 So. 529, 531 (1927) ("This court has repeatedly approved the doctrine announced in *Hadley v. Baxendale*."); *Scott v. Rolling Hills Place Inc.*, 688 So. 2d 937, 940 (Fla. 5th DCA 1996) (explaining that "[d]amages which flow naturally from the breach, and were foreseeable by the breaching party at the time the contract was entered, are recoverable.").

[5] *See generally Alejandre v. Bull*, 153 P. 3d 864, 874 (Wash. 2007) (Chambers, J., concurring) ("Tort remedies are often, perhaps always, significantly larger than contract remedies."); *Grams v. Milk Prods., Inc.*, 699 N.W. 2d 167, 171 (Wis. 2005) ("Tort law generally offers a 'broader array' of damages than contract.").

actions in tort, even where the relationship with the wrongdoer is born of a contract and the resulting injury, a pure economic loss, is sustained from a failure to properly perform a contractual obligation. The result is that without any limitation, the law of contract and the societal good it serves[6] is at risk of being swallowed by a sea of tort. *See* G. Gilmore, *The Death of Contract*, 87–94 (1974). In response to this risk, judicially created boundary doctrines emerged, including the economic loss rule and the independent tort doctrine. Palmeri, John M. and Barnett, Monty L. (1996) *The Continuing Vitality of the Economic Loss Rule*, Land & Water L. Rev.: Vol. 31: Iss. 2, pp. 757–73 (explaining that the economic loss rule finds its roots in the English common law which generally defined legal duties in terms of contractual relationships. With the gradual expansion of tort law, the rule was developed in an effort to define the outer limits of tort liability); Danielle Sawaya, *Not Just for Products Liability: Applying the Economic Loss Rule Beyond Its Origins*, 83 Fordham L. Rev. 1073, 1097–1102 (2014) (explaining the importance of the economic loss rule in contractual privity cases to protect the boundary between tort and contract). In modern times, it appears that every jurisdiction in the United States has some form of the economic loss rule or independent tort doctrine. Margaret

---

[6] Contract law allows consenting parties to allocate risk in a bargained-for exchange. Economic philosophers Adam Smith and John Stuart Mill believed that the freedom to contract not only contributed certainty and stability in the marketplace, but "[w]as the fundamental and indispensable requisite of progress." Samuel Williston, *Freedom of Contract*, 6 Corn. L. Q. 365, 366 (1921).

Wykowski, Comment, *Clarifying Washington's Approach to the Independent Duty Doctrine*, 95 Wash. L. Rev. 1091, 1096 (2020). In other states, the economic loss rule is considered by some to be the strongest judicially created boundary. Mark A. Geistfeld, *The Contractually Based Economic Loss Rule in Tort Law: Endangered Consumers and the Error of East River Steamship*, 65 DePaul L. Rev. (2016).

Florida courts once routinely applied this rule, which rule was premised on the definition of economic loss, and defined by the Florida Supreme Court as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property." *Tiara Condo. Ass'n v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 401 (Fla. 2013) (quoting *Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244, 1246 (Fla. 1993)).

With a focus on the nature of the loss, the rule in Florida evolved beyond the product liability realm to protect the contract by forbidding parties in privity from suing in tort to recover pure economic losses. *Id.* Under this widely accepted evolution[7] of the rule, parties were effectively prevented "from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort." *Id.* at 402 (quoting *Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.*, 891 So.

---

[7] This iteration of the rule is sometimes known as the contractual privity branch of the economic loss rule.

9

2d 532, 536 (Fla. 2004)).[8] But this was not to last in Florida. In 2013, the Florida Supreme Court abolished the previously embraced contractual privity branch of the economic loss rule in *Tiara*. *Id.* at 399.[9] But while the formal rule was abolished, the *Tiara* court itself debated the effect of its decision, with Justice Canady asserting that it represented a sea-change in the law and Justice Pariente claiming that not much had changed at all. *Id.* at 409, 414 (Pariente, J. concurring) (Canady, J. dissenting). Justice Pariente defended *Tiara* against the charge that it expanded viable tort claims, by stating that other basic common law principles already protected the boundary between tort and contract. *Id.* at 408 (Pariente, J. concurring). And it is this concurrence that many have seen as a reference to another boundary doctrine, the independent tort doctrine, which prohibits a plaintiff from recovering in tort for a contract dispute unless the tort is *independent* of any breach of contract.

---

[8] Many states, including Florida, recognized exceptions to this strict rule. Most notably, those injured by incompetence could still pursue professional malpractice claims in tort, despite the existence of a contract between the professional and the plaintiff. *Moransais v. Heathman*, 744 So. 2d 973, 983 (Fla. 1999) ("While provisions of a contract may impact a legal dispute, including an action for professional services, the mere existence of such a contract should not serve per se to bar an action for professional malpractice.").

[9] This decision came to be because the Eleventh Circuit, "consistent with its understanding that Florida had adopted a contractual privity economic loss rule, certified to the Florida Supreme Court the question whether an insurance broker is a 'professional' subject to a carveout from the economic loss rule." Catherine M. Sharkey, *In Search of the Cheapest Cost Avoider: Another View of the Economic Loss Rule*, 85 U. Cin. L. Rev. 1017, 1037 (2018). But the Florida Supreme Court changed the certified question, asking instead whether the economic loss rule applies outside the realm of products cases and answered that question in the negative.

10

*Id.* at 408 (Pariente, J. concurring); *see also Peebles v. Puig*, 223 So. 3d 1065, 1068 n.4 (Fla. 3d DCA 2017) (Our sister court, in a footnote, makes clear it did not evaluate the case under the economic loss rule, and in stating as much, affirmed the existence of the independent tort doctrine.); *Certain Underwriters at Lloyd's of London, UK Subscribing to Pol'y No. B1230AP56189A14 v. Ocean Walk Resort Condo. Ass'n, Inc.*, No. 616CV258ORL37GJK, 2017 WL 3034069, at *10 (M.D. Fla. July 18, 2017) (comparing two decisions from U.S. Court of Appeals for the Eleventh Circuit discussing the application of Justice Pariente's concurrence in *Tiara*: *Lamm v. State St. Bank & Tr.*, 749 F. 3d 938, 947 (11th Cir. 2014), which stated that, despite the limitation of the economic loss rule in *Tiara*, the decision *may* "have left intact a separate hurdle, namely that 'a party still must demonstrate that the tort is independent of any breach of contract claim'" and *Lookout Mountain Wild Animal Park, Inc. v. Stearns Zoological Rescue & Rehab Ctr., Inc.*, 553 Fed. App'x. 864, 866 (11th Cir. 2014), in which the court cited Justice Pariente's concurrence in support of its conclusion that the plaintiff had not identified any tortious acts sufficiently independent of the alleged breach of contract to render the tort claims viable).

Following *Tiara*, Florida courts have required that tort claims brought between parties in contractual privity be "independent" of any breach of contract, and we join them now in that requirement. *See Kenny v. Everlong, LLC*, 398 So. 3d 418 (Fla. 4th DCA 2024); *see also Island Travel & Tours, Ltd., Co. v. MYR Indep.,*

*Inc.*, 300 So. 3d 1236, 1239 (Fla. 3d DCA 2020) (courts continue to apply the independent tort doctrine to prevent plaintiffs from recovering in tort what is essentially a contract dispute); *Marian Farms, Inc. v. Suntrust Banks, Inc.*, 135 So. 3d 363, 363 (Fla. 5th DCA 2014) (finding a basis for liability against the bank based on an independent duty owed to the plaintiff distinct from the depository agreement). And when applying Florida law, federal courts have followed suit. *Cont'l Gen. Ins. Co. v. Gardina*, 773 F. Supp. 3d 1294, 1299–300 (M.D. Fla. 2025) (explaining that while it was initially uncertain whether the independent tort rule had survived the *Tiara* decision, in the years since *Tiara*, the Eleventh Circuit and the district courts have continued to apply Florida's independent tort rule.). We note however that, as of yet, no precise, universal test exists for distinguishing an "independent" tort. *See generally Lamm*, 749 F. 3d at 947 ("exact contours of [the independent tort rule], as applied post-*Tiara*, are still unclear"). While some courts search for the source of duty, others compare conduct, and still others analyze the nature of damages sought. The variety of considerations has generated several formulations which to date elude a single canonical rule that the bench and bar can easily apply in every court across the state. Because each consideration has value as an indicator of independence, we review them now, as well as a carryover consideration from the old economic loss rule—public policy.

1.

Unlike claims that rely on contractual relationships, an "independent" tort is often characterized by a duty imposed by law rather than by agreement. As to this consideration, United States District Court Judge Steven Merryday has explained that the independent tort doctrine honors the same divide as the economic loss rule, but rather than looking at the nature of the loss, it focuses on the source of the duty allegedly breached. "If a contract imposes a duty, and the defendant breaches that duty, the plaintiff must sue for breach of contract. If society imposes the duty, the plaintiff must sue in tort." *Travelers Indem. Co. of Conn. v. Richard McKenzie & Sons, Inc.*, 326 F. Supp. 3d 1332, 1345 (M.D. Fla. 2018), *aff'd*, 10 F.4th 1255 (11th Cir. 2021). Following this reasoning, courts should consider whether the alleged breach of a duty in tort coincides or overlaps with a duty imposed by a contract. If the duty at issue is within the scope of a contract, and the relationship of the parties that led to the creation of that duty stems from a contract, then that duty's source is from contract and any alleged tort claims based on a breach of those duties may not be "independent."

But the analysis may not end there, as "independent" torts can be characterized by "other conduct" and distinct damages. The "other conduct" consideration requires that for a tort claim to exist alongside a breach of contract, the tort must arise from acts independent of the contract's breach. *XP Glob., Inc. v. AVM, L.P.*, No. 16-cv-80905, 2016 WL 4987618, *4, *6 (S.D. Fla. Sept. 19, 2016).

It requires proof of facts separate and distinct from the contract breach. *Invo Fla., Inc. v. Somerset Venturer, Inc.,* 751 So. 2d 1263, 1265 (Fla. 3d DCA 2000). In other words, under this consideration, the bad conduct serving as the predicate for the breach of contract claim must go beyond a failure to comply with the contract. *Frutafino, S.A.S. v. Dole Chile, S.A.*, 405 So. 3d 497, 500 (Fla. 3d DCA 2025); *see also Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.,* 482 So. 2d 518, 519 (Fla. 3d DCA 1986) ("[A] breach of contract, alone, cannot constitute a cause of action in tort. . . . It is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such breach can constitute negligence.").

Finally, in some circumstances, the nature of the loss may also be of guidance, as the nature of the loss often informs whether society has imposed an "independent" duty. *Peebles,* 223 So. 3d at 1068 (considering the nature of the loss in evaluating whether the alleged tort is independent). While *Tiara* abolished the perhaps overly simplistic contractual privity branch of the economic loss rule, the remaining independent tort doctrine should still consider the nature of the harm at issue as an indication of whether the claim asserted is truly independent of a contract or is simply a recasting of a contract action into a tort action.

With most broken contracts, injuries are measured in the harm to a party's economic interests, not in the harm to a party's person or property. When claims in tort are brought seeking identical damages to those available by contract and are clearly economic in nature, that is a strong indicator that the alleged tort claims are

14

not "independent." *Peebles,* 223 So. 3d at 1069. Conversely, when claims are brought in tort seeking damages for personal injury or other non-economic damages, that is a strong indicator that some independent duty is at stake.[10] While the nature of the damages is no longer a per se rubric after *Tiara*, their nature is still relevant in determining whether the tort claim brought is truly independent of a related contract. *Island Travel & Tours, Co.,* 300 So. 3d at 1240 n.7.[11] For those reasons, courts should continue to consider the nature of the damages sought.

In the end, beyond examining duty, conduct, and damages, one last overriding consideration must be addressed—public policy. Because there are some duties which the law will not allow a party to avoid by contract, the old economic loss rule prohibited some torts from being dismissed when public policy forbade dismissal. For example, professionals who negligently performed a contracted-for service were

---

[10] Consider the following example as to the indicative nature of damages. A daycare negligently allows a child to come to harm. Those damages are decidedly non-economic. But the source of the daycare's obligation is contractual, and the conduct complained of certainly qualifies as a broken promise to the parents who entrusted the child to the daycare. But even though the conduct complained of breaches the contract, it is also a breach of other duties imposed under the law which are truly independent of the contract and often immutable regardless of a specific contract's attempts to waive or assume risk. Examining the nature of damages in this example more clearly illustrates the independence of the underlying tort.

[11] One benefit to the contractual privity branch of the economic loss rule was the simplicity in looking at the type of damages as the rubric. *See generally* Judge Lisa T. Munyon and Judge Alice L. Blackwell, *Tort and Contract Actions: Strange Bedfellows No More In The Wake of Tiara Condominium*, Fla. B.J., Dec. 2013, at 41.

still liable in tort for malpractice. *Moransais*, 744 So. 2d at 983 ("While provisions of a contract may impact a legal dispute, including an action for professional services, the mere existence of such a contract should not serve per se to bar an action for professional malpractice."). That is so because, despite recognizing the parties' general freedom to set the boundaries of their duties and rights voluntarily, courts across the country, including the Florida Supreme Court, determined that such freedom was not absolute and created certain exceptions to the old economic loss rule born out of public policy considerations. Those previously identified exceptions, should be honored under the independent tort doctrine.

2.

Applying these considerations to the Trust's negligence claim against One Source confirms the trial court's finding that it is a "dependent" tort, because whether one considers the source of the duty, the nature of the conduct and damages, or public policy, the negligence claim is not independent. The Complaint alleges One Source voluntarily contracted for the obligation of operating and leasing fourteen rental homes and then delegated the performance of that obligation to its employee Rozanc. The duty to manage, operate and lease the rental homes stemmed from the Management Agreement and not from some duty imposed by society. The

16

Trust attempts to recast their claim under a theory of general negligence, and no other tort is alleged.[12]

The allegations in the negligence claim are simply that One Source and Rozanc owed a general duty of care to the Trust. As the duty is obviously generated by the Management Agreement, it was incumbent upon the Trust to plead a factual basis to support a general duty independent of any contractual obligation.[13] Failing to do so here dooms the Trust's negligence claim against One Source.

Turning to conduct, the Trust does not articulate any "other conduct" which amounts to anything that would not also be a breach of contract. The major purpose of the Management Agreement was to entrust care of the properties to someone else, and to ensure that such care was possible, One Source and Rozanc were entrusted with the legal power to control the properties. The powers and duties of One Source and Rozanc stem from the Management Agreement and its related documents, and

---

[12] For example, the Trust does not allege that One Source or Rozanc are professionals or that they are governed by independent bailment duties or other statutory, regulatory, or policy impositions.

[13] To the extent the Trust is relying on the undertaker's doctrine, we note two things. First, the doctrine subjects one to liability for physical harm that results, which is not the case here. *Wallace v. Dean*, 3 So. 3d 1035, 1052 (Fla. 2009); *see also Muchnick v. Goihman*, 245 So. 3d 978, 981 (Fla. 3d DCA 2018) (once the real estate agent made the promise to fix the problems in the apartment, and managed the repairs, he had a duty through the undertaker's doctrine to exercise reasonable care in making the repairs). Second, to allow an obligation voluntarily assumed by contract to also create an obligation imposed by society because it was "undertaken" would render the independent tort doctrine obsolete.

the conduct at issue is a complaint that One Source broke its contractual promise to manage and care for the properties. Because One Source's alleged tortious conduct is the same bad conduct that serves as the predicate for the breach of contract claim, the tort is not independent under this consideration either.

Additionally, the damages pled in the Trust's negligence claim are economic in nature and the nature of damages sought in tort is identical to the nature of the damages sought in contract, namely the return of, or the value of, the properties, the lost rent, etc. There is no allegation of personal injury, or even of physical injury to the properties. While improperly selling someone's property is an injury, it is an economic injury and for that reason is more properly considered part and parcel of the parties' economic relationship as governed by their contract, not a physical injury or extra-contractual injury often independently governed by society's many other imposed duties. This factor also points to the negligence claim being "dependent" on the Management Agreement.

As to the final consideration, the Trust does not identify any broader societal interest previously recognized as sufficient to override the application of a boundary doctrine that, if enforced, would preclude the tort claim. And it is obvious here that none exists. *Travelers Indem. Co. of Conn.*, 326 F. Supp. 3d at 1346 (explaining that although society imposes a tort duty on a doctor or a lawyer, for example, to perform non-negligently the duties for which they have contracted with a patient or client, society has not imposed such a duty on nonprofessionals.). Contracting with a real

18

estate management company to manage real property is much different than

contracting with a professional engineer to design a suspension bridge that thousands

will use every day or signing an exculpatory clause in favor of a commercial

company offering children the opportunity to experience risky adventures.[14] *See*

*generally Green Hills (USA), L.L.C. v. Aaron Streit, Inc.*, 361 F. Supp. 2d 81, 90

(E.D.N.Y. 2005) (examining several public policy reasons for exempting

professional malpractice claims from the reach of boundary doctrines, including that

the nature of the work performed by professionals, creates a "significant public

interest, and the breach of those duties could have dramatic consequences."). As

there is no previously recognized reason for depriving the parties in this appeal from

the ability to allocate risk in a bargained-for exchange and, also of importance,

because the party that seeks to bring the tort claim has never identified a previously

---

[14] Another example where public policy may limit freedom of contract involves minors. *See generally Applegate v. Cable Water Ski, L.C.*, 974 So. 2d 1112, 1114 (Fla. 5th DCA 2008) (exculpatory clause in contract signed by parents could not be enforced by a commercial enterprise to the determinant of an injured minor). Based on public policy concerns, in 2008 the Florida Supreme Court found unenforceable a pre-injury release executed by a father on behalf of his minor son because it prevented the minor's estate from bringing a cause of action against the commercial establishment that provided the activity which resulted in the minor's death. *Kirton v. Fields*, 997 So. 2d 349, 358 (Fla. 2008). Since then, the legislature passed a statute to limit *Kirton*'s holding by permitting parents to release a commercial activity provider for a child's injuries occurring as a result of the inherent risk of the activity under certain circumstances. *See* § 744.301(3) Fla. Stat. (2010).

recognized public policy interest that would override the application of the independent tort doctrine, this consideration is of no moment in this case.

In the end, while a test for every case is difficult to capture in a single formula, reviewing our sister courts' considerations of duty, conduct, damages, and public policy can help distinguish an "independent" tort from a "dependent" tort. While in this case all of the considerations point towards dismissal of the Trust's negligence action, we do not imply that these considerations are anything other than indicators which must be examined in the totality of the circumstances. Based on these considerations, we affirm the trial court's dismissal of the Trust's negligence action against One Source.

## III.

In its final issue raised on appeal, the Trust argues the trial court erred in dismissing with prejudice its negligence claim against Rozanc, who was tasked with carrying out One Source's duties under the Management Agreement. Having found the independent tort doctrine bars a tort claim against One Source, we hold that officers and employees, such as Rozanc, are similarly shielded when their liability in tort arises solely from the deficient performance of their employer's contractual duty.

As the Fifth District recognized in *Vesta Construction & Design, L.L.C. v. Lotspeich & Assocs., Inc.*, "when a suit is barred against a corporation by the contractual privity economic loss rule, the contracting party cannot bypass the rule

by suing corporate employees." 974 So. 2d 1176, 1180 (Fla. 5th DCA 2008). "Given that a corporation can only act through its employees, it would completely undermine the contractual privity economic loss rule to allow any party which contracts with a corporation to avoid the rule by simply bringing its tort claim directly against the corporate officers or employees tasked with performing the contract on behalf of the corporation." *Id.*

While some have questioned the continued validity of *Vesta Construction*, treating the opinion as a relic of the bygone doctrine abolished in *Tiara*, we find its logic applies with equal force to the independent tort doctrine. *See generally IdentiRx, LLC v. Pharm. Project Sols., Inc.,* No. 2:25-CV-480-SPC-DNF, 2025 WL 2732852, at \*3 (M.D. Fla. Sept. 25, 2025).

The economic loss rule and independent tort doctrine are both boundary doctrines, and both must shield corporate officers and employees tasked with performing the contract on behalf of the corporation for the boundary to survive. Limiting the scope of independent tort doctrine to signatories when the party to the contract is a corporation would allow plaintiffs to bypass the bargained-for risk allocations in a contract. To maintain the integrity of the independent tort doctrine, we adopt Judge Lawson's well-reasoned decision in *Vesta Construction,* and hold that although Rozanc is not personally in privity, the independent tort doctrine still

21

shields her from liability from torts which arise solely from her negligent performance of the Management Agreement as an employee.[15]

In so holding, we recognize the Fourth District, under different facts involving a corporate officer's fraudulent representations, stated that the independent tort doctrine does not shield officers and employees who are not a party to the agreement. *Costa Invs., LLC v. Liberty Grande, LLC*, 353 So. 3d 627, 632 (Fla. 4th DCA 2022) (citing *Un2JC Air 1, LLC v. Whittington*, 324 So. 3d 1, 3 (Fla. 4th DCA 2021)) ("This principle *only* applies, however, to the parties to the contract."). But our case, as pled, does not concern fraudulent representations, and the distinction makes a difference because the facts set forth in *Costa* suggest the tort was already independent, obviating any need for the *Costa* court to declare that the protection provided by the independent tort doctrine was strictly limited to signatories. Recognizing though the inherent tension between the pure privity requirement stated in *Costa* and the rationale for protecting a boundary doctrine set forth in *Vesta Construction*, we ask for the Florida Supreme Court's guidance in determining the proper test and reach of Florida's independent tort doctrine.

Based on the foregoing, we affirm in part and reverse in part, remanding only for the Trust's breach of contract claim against One Source to proceed. We also

---

[15] We do not reach whether or not the Trust could have brought other torts that would be independent. We react only to what was pled here.

certify two questions of great public importance, both of which we passed upon in this decision. Fla. R. App. P. 9.030(a)(2)(A)(v).

CERTIFIED QUESTIONS:

1) IN APPLYING THE INDEPENDENT TORT DOCTRINE, HOW SHOULD COURTS DISTINGUISH AN "INDEPENDENT" TORT FROM A "DEPENDENT" TORT?

2) DOES THE INDEPENDENT TORT DOCTRINE SHIELD OFFICERS AND EMPLOYEES WHO ARE NOT A PARTY TO A CONTRACT WHEN THEIR LIABILITY IN TORT ARISES SOLELY FROM THEIR DEFICIENT PERFORMANCE OF A CONTRACTUAL DUTY ASSUMED BY A CORPORATION THAT WAS A PARTY TO THE CONTRACT AND ON WHOSE BEHALF THEY WERE ACTING?

AFFIRMED in part; REVERSED and REMANDED in part; QUESTIONS CERTIFIED.

WOZNIAK and BROWNLEE, JJ. concur.


Ronald M. Gaché and Scott A. Simon, of LOGS Legal Group, LLP, Boca Raton, for Appellant.

Eric P. LaRue, II, and Cristina A. Cantillana Tapia, of The LaRue Firm, PLLC, Winter Park, for Appellees, Brenda Rozanc and One Source Management Solutions, Inc.

No Appearance for Other Appellees.


NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING AND DISPOSITION THEREOF IF TIMELY FILED